366 So.2d 710 (1979)
TRANS-LUX CORPORATION, a Delaware Corporation, and Gus Roberts
v.
STATE of Alabama ex rel. Eugene SWEETON, Chief of Police of the City of Huntsville, Alabama.
77-651.
Supreme Court of Alabama.
January 19, 1979.
*711 Julian D. Butler and Steven R. Berryman, of Butler & Potter, Huntsville, for appellants.
Charles H. Younger, Huntsville, for appellee.
*712 PER CURIAM.
This is an appeal from a judgment holding that the exhibition of the motion picture "The Opening of Misty Beethoven" in an enclosed movie theater constitutes a nuisance abatable under the Alabama Red Light Abatement Act, §§ 6-5-140 to -154 (Code 1975). The judgment permanently enjoined the defendants from exhibiting the motion picture. We affirm.
This action was commenced by Eugene Sweeton, Chief of Police of the City of Huntsville, as a private citizen, seeking both a preliminary injunction and a permanent injunction to halt the showing of the film "The Opening of Misty Beethoven" at the Trans Lux Twin Theatre in Huntsville. He alleged that the film was lewd and obscene, and that the knowing and wilful showing of such a film by the defendants constituted an abatable nuisance under §§ 6-5-140 to -154 (Code 1975).
The theater is an enclosed motion picture house showing a variety of movies for which an admission price is charged, including an occasional "X" rated film. The movie in question was shown at the Trans Lux Theatre from August 5, 1977, until September 2, 1977, and from September 13, 1977, until October 3, 1977. It was stipulated that no member of the public under the age of eighteen years was admitted to view the film.
On August 13, 1977, four members of the Huntsville Police Department vice squad viewed the film at the theater. Vice squad officers viewed the film partially or in its entirety on at least three subsequent occasions. Sweeton filed his complaint on September 16, 1977. The trial judge set a hearing on the application for a preliminary injunction on September 22, 1977, but continued it until October 3,1977, on motion of the defendants, who had not been served with a summons until fifteen minutes before the hearing.
After the hearing on October 3, during which the trial judge viewed the film, he issued an order finding that "The Opening of Misty Beethoven" is "obscene under the laws of the State of Alabama * * *, and as such is not within the scope of speech protected by the First Amendment to the Constitution of the United States." The court found that the exhibition of the obscene film constituted a public nuisance and enjoined the defendants from showing it pending a final determination on the merits. There was no express finding as to the standards followed by the trial court in determining the obscenity vel non of the film.
A final hearing was held on March 16, 1978. No new evidence was presented. The court's order dated March 20, 1978, found that exhibiting the film constituted a public nuisance and permanently enjoined the defendants from exhibiting that specific motion picture. Defendants appealed following denial of their motion for a new trial.
Two issues are raised on this appeal. I. May the Alabama Red Light Abatement Act, §§ 6-5-140 to -154 (Code 1975), be applied to the exhibition of a single motion picture found to be obscene? II. If so, is this film, "The Opening of Misty Beethoven," obscene? We answer both questions in the affirmative.

I.
The question of the applicability of our Red Light Abatement Act to motion pictures has been considered by this Court on one prior occasion, General Corp. v. State ex rel. Sweeton, 294 Ala. 657, 320 So.2d 668 (1975), cert. denied, 425 U.S. 904, 96 S.Ct. 1494, 47 L.Ed.2d 753 (1976), "Sweeton I." A discussion of that case is a necessary preliminary to the resolution of the first issue presented by this appeal.
In Sweeton I, a complaint was filed under the Red Light Abatement Act by the same party who filed the action in the instant case, i. e., the Chief of Police of the City of Huntsville. The complaint alleged that the defendant had continuously shown obscene films over a period of nineteen months in the Fox Cinema Theatre, an enclosed adult movie house. The trial judge found that the movies shown were obscene and that *713 the exhibition of the movies was a public nuisance. The court ordered that the defendant be perpetually enjoined from maintaining the nuisance, that all personal property in the theater be sold, and that the theater be closed for all purposes for one year. This court reversed. Mr. Justice Almon authored the plurality opinion with which Justices Merrill, Faulkner, and Embry concurred. Justice Maddox concurred specially, Justice Jones concurred in the result, and Chief Justice Heflin and Justices Bloodworth and Shores concurred in the result in an opinion authored by the Chief Justice. The specific holding, as stated in the plurality opinion, was that "the Alabama Red Light Abatement Act cannot constitutionally be employed to enjoin prospectively the showing of films in enclosed movie theatres to an adult audience * * *." Sweeton I, supra, 294 Ala. at 666, 320 So.2d at 676. The constitutional defect contained in the trial court's judgment was the closing of the theater for one year for all purposes, which amounted to prior restraint at its worst.
The plurality and the special concurrence did not close the door to all possible application of the Red Light Abatement Act to obscene movies. During the course of the opinion, the plurality made the following observations regarding the use of the Red Light Abatement Act in the area of first amendment rights (with which conclusions Justice Maddox concurred):
(1) Traditionally, continuing activity contrary to public morals or decency is a public nuisance. 294 Ala. at 663, 320 So.2d at 672-73.
(2) The use of the definition of obscenity contained in the criminal obscenity statutes is proper in this civil proceeding. 294 Ala. at 664, 320 So.2d at 673.
(3) The Miller standards are incorporated into the definitions contained in the Red Light Abatement Act. 294 Ala. at 664, 320 So.2d at 674.
(4) There is no indication that the legislature intended either to include or exclude the application of the Act to obscene material. Id.

(5) The complaining party has the burden of proof on the question of obscenity under the Act. 294 Ala. at 664-65, 320 So.2d at 674.
(6) The Act meets all requirements for prompt judicial review of any suppression of the defendant's activities. 294 Ala. at 665, 320 So.2d at 674-75.
(7) The closing of a theater for all purposes in this situation, as required by §§ 6-5-147 and -151(b) (Code 1975), is not constitutionally permissible. 294 Ala. at 665-66, 320 So.2d at 675-76.
The plurality opinion then stated two first amendment situations in which the Act might permissibly be used, the first of which is the precise situation present in the instant case:
"The first would be where the impact of the injunction is absolutely devoid of prior restraint or chilling effect upon prospective exercises of expression other than that adjudicated as obscene. More specifically, where there has been a prompt adversary proceeding in which all the requisite constitutional standards for ascertaining the issue of obscenity have been met and the particular film has been found to be obscene; future exhibition of that particular film may well constitute a public nuisance and be permanently enjoined as such. . . ."
294 Ala. at 666, 320 So.2d at 676.
We reaffirm Sweeton I in concluding that the Red Light Abatement Act may be used to enjoin permanently as a nuisance the exhibition of a particular motion picture found to be obscene, if the provisions of the Act ensuring prompt judicial review of the question of obscenity and providing for a prompt hearing on the merits of the permanent injunction are followed.
The initial section of the Red Light Abatement Act, § 6-5-140 (Code 1975), defines nuisance as "[a]ny place in or upon which lewdness, assignation or prostitution is conducted, permitted, continued or exists and the personal property and contents used in conducting or maintaining any such *714 place for any such purpose." (Emphasis added.)
We conclude that "lewdness" includes the exhibition of an obscene motion picture in a public place, such as an enclosed motion picture theater, and that a motion picture is "obscene" if it meets the definition of "obscene" contained in our criminal statutes, § 13-7-161 or § 13-7-180 (Code 1975). Section 13-7-180, as written, incorporates the guidelines set forth in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). This Court, by judicial construction, incorporated the Miller standards into § 13-7-161 in Pierce v. State, 292 Ala. 473, 296 So.2d 218 (1974), cert. denied, 419 U.S. 1130, 95 S.Ct. 816, 42 L.Ed.2d 830 (1975).
Examples of sexual conduct which may be found to be obscene when depicted on film are set out with specificity in § 13-7-180. While § 13-7-161 does not contain such a list, the incorporation of the Miller standards into this section supplies sufficient notice of what is obscene, i. e., patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.[1]
We reaffirm the seven principles or observations from Sweeton I, listed hereinabove, including the incorporation of Miller standards into the Act. The United States Supreme Court, in Miller, invited such incorporation to provide the required specificity to statutes which would otherwise be too broad. Miller v. California, 413 U.S. at 24 & n.6,93 S.Ct. 2615 & n.6, 37 L.Ed.2d at 430 & n.6. Accord, United States v. 12 200-Ft. Reels of Super 8mm. Film, 413 U.S. 123,130 n.7, 93 S.Ct. 2665, 2670 n.7, 37 L.Ed.2d 500, 507 n.7 (1973). Moreover, the United States Supreme Court commented favorably upon the use of civil injunction statutes against obscene materials, provided constitutional standards are followed to determine whether or not the materials are obscene. Paris Adult Theatre I v. Slaton, 413 U.S. 49, 54-55, 93 S.Ct. 2628, 2633-34, 37 L.Ed.2d 446, 455 (1973).
Alabama is not the only state to sanction the use of a civil nuisance statute to combat obscenity. The Ohio Court of Appeals enjoined the exhibition of the film "Without a Stitch," employing a civil nuisance statute almost identical to our Red Light Abatement Act, with one important exception. The Ohio Red Light Abatement Act specifically covers movie "films." State ex rel. Ewing v. "Without a Stitch", 28 Ohio App.2d 107, 276 N.E.2d 655 (1971). A majority of this Court agreed in Sweeton I, supra, and we reaffirm today that the Alabama statute covers movies.
The Ohio Court of Appeals' decision was modified and affirmed by the Ohio Supreme Court at 37 Ohio St.2d 95, 307 N.E.2d 911 (1974). On appeal to the U.S. Supreme Court, the defendant asserted that the Ohio nuisance statute was constitutionally defective on a number of grounds, including (1) overbreadth of the definition of nuisance through the Ohio Supreme Court's engrafting upon the statute the definitions of obscenity contained in Ohio's criminal statutes; (2) issuance of temporary restraining orders and preliminary injunctions before a hearing; (3) prior restraint through closing of the theater for all purposes for one year; and (4) lack of assurance of prompt hearings. Appellant's Jurisdictional Statement at 7-12. The U.S. Supreme Court dismissed the appeal for want of a substantial federal question. Art Theater Guild, Inc. v. Ewing, 421 U.S. 923, 95 S.Ct. 1649, 44 L.Ed.2d 82 (1975).
A dismissal by the U.S. Supreme Court for want of a substantial federal question is a determination on the merits of the issues presented for review. State courts are bound by the finding that a question is unsubstantial until the U.S. Supreme Court informs them otherwise. Hicks v. Miranda, 422 U.S. 332, 95 S.Ct. *715 2281, 45 L.Ed.2d 223 (1975). Therefore, the finding in the Ewing case that the four issues listed above are not substantial federal questions provides further support for the view that the Alabama Red Light Abatement Act may be employed to halt the exhibition of an obscene motion picture. See also Slaton v. Paris Adult Theatre I, 231 Ga. 312, 201 S.E.2d 456 (1973), cert. denied, 418 U.S. 939, 94 S.Ct. 3227, 41 L.Ed.2d 1173 (1974); Evans Theatre Corp. v. Slaton, 227 Ga. 377, 180 S.E.2d 712, cert. denied, 404 U.S. 950, 92 S.Ct. 281, 30 L.Ed.2d 267 (1971).

II.
Having determined that the Red Light Abatement Act may be applied to the exhibition of a single obscene movie, we must now determine whether or not the film "The Opening of Misty Beethoven" is "obscene."
In Alabama, appellate courts are to make an independent determination of obscenity, regardless of the determination made by the trial court. Pierce v. State, supra.
This movie has been viewed, and the Court finds it is "obscene." The average person, applying contemporary community standards, would find that the film, taken as a whole, appeals to the prurient interest.
The community standards considered are statewide standards. Pierce v. State, supra. Appellants complain that the appellee presented no evidence of community standards but they do not contend that they themselves were prevented from introducing such evidence. This is not a ground for reversal, however, since the complaining party need not present any "expert" testimony to prove obscenity once the allegedly obscene material is itself placed in evidence. Kaplan v. California, 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973); Paris Adult Theatre I v. Slaton, supra.
The film depicts, in a patently offensive way, sexual conduct, actual and simulated, normal and perverted. There are numerous scenes of explicit sexual conduct between members of the same sex and members of the opposite sex, including cunnilingus, sexual intercourse, masturbation, and fellatio. These scenes are not isolated instances, but instead are repetitive displays of explicit sexual conduct.
The film, taken as a whole, lacks serious literary, artistic, political or scientific value. The dominant theme is the exploitation of sex and nudity. Appellants do not pretend that the movie is serious art, or expresses a serious political viewpoint or serves some serious scientific purpose. They do contend that the movie is not obscene and cite the testimony of several vice squad officers, who testified that the film was boring, funny, and softcore. But, as we have already noted, expert affirmative evidence is not required to prove obscenity once the materials themselves are placed in evidence. The film itself is the best evidence of what it represents. Paris Adult Theatre I, supra, 413 U.S. at 56, 93 S.Ct. at 2634-35, 37 L.Ed.2d at 456.
We point out, as we did in Sweeton I, that our holding today should not be considered a green light for prospective control by the Red Light Act of individual obscene films.
Application of the Red Light Abatement Act must be accompanied by strict observation of first amendment rights and safeguards. For example, the closing of the place found to be a nuisance, for all purposes for one year, as required in §§ 6-5-147 and -151(b), cannot be applicable to first amendment rights, for this would constitute an impermissible prior restraint.
It would be desirable, although not strictly necessary, for the trial judge to explain in his order the standards he followed in determining obscenity vel non, both as an aid to appellate review as well as to avoid the appearance of arbitrary action.
To further protect first amendment rights, trial courts must follow § 6-5-149 (Code 1975), which provides that a Red Light Abatement action has priority over *716 all other actions except injunctions. This provision ensures a prompt, final determination on the merits before a permanent injunction may issue.
The policy underlying the regulation of obscenity, whether by civil nuisance statutes or by criminal penalties, is set forth in the following excerpt from Paris Adult Theatre I v. Slaton, supra, which we feel expresses the views of the majority of the citizens of Alabama:
"In particular, we hold that there are legitimate state interests at stake in stemming the tide of commercialized obscenity, even assuming it is feasible to enforce effective safeguards against exposure to juveniles and to passersby. Rights and interests `other than those of the advocates are involved.' Breard v. Alexandria, 341 U.S. 622, 642, 71 S.Ct. 920, 932, 95 L.Ed. 1233 (1951). These include the interest of the public in the quality of life and the total community environment, the tone of commerce in the great city centers, and, possibly, the public safety itself. The Hill-Link Minority Report of the Commission on Obscenity and Pornography indicates that there is at least an arguable correlation between obscene material and crime. Quite apart from sex crimes, however, there remains one problem of large proportions aptly described by Professor Bickel:
`It concerns the tone of the society, the mode, or to use terms that have perhaps greater currency, the style and quality of life, now and in the future. A man may be entitled to read an obscene book in his room, or expose himself indecently there . . . . We should protect his privacy. But if he demands a right to obtain the books and pictures he wants in the market, and to foregather in public placesdiscreet, if you will, but accessible to all with others who share his tastes, then to grant him his right is to affect the world about the rest of us, and to impinge on other privacies. Even supposing that each of us can, if he wishes, effectively avert the eye and stop the ear (which, in truth, we cannot), what is commonly read and seen and heard and done intrudes upon us all, want it or not.' 22 The Public Interest 25-26 (Winter 1971). (Emphasis added.)"
"As Mr. Chief Justice Warren stated, there is a `right of the Nation and of the States to maintain a decent society . . .,' Jacobellis v. Ohio, 378 U.S. 184, 199, 84 S.Ct. 1676, 1684, 12 L.Ed.2d 793 (1964) (dissenting opinion). See Memoirs v. Massachusetts, 383 U.S. 413, 457, 86 S.Ct. 975, 996, 16 L.Ed.2d 1 (1966) (Harlan, J., dissenting); Beauharnais v. Illinois, 343 U.S. 250, 256-257, 72 S.Ct. 725, 730-731, 96 L.Ed. 919 (1952); Kovacs v. Cooper, 336 U.S. 77, 86-88, 69 S.Ct. 448, 453-454, 93 L.Ed. 513 (1949)." [Footnotes omitted.]
413 U.S. at 57-60, 93 S.Ct. at 2635-36, 37 L.Ed.2d at 457-58.
AFFIRMED.
TORBERT, C. J., and MADDOX, FAULKNER, ALMON and EMBRY, JJ., concur.
BLOODWORTH and SHORES, JJ., concur specially.
JONES and BEATTY, JJ., dissent.
BLOODWORTH, Justice. (concurring specially.)
Because I concurred in Chief Justice Heflin's special concurrence in General Corp. v. State ex rel. Sweeton, 294 Ala. 657, 320 So.2d 668 (1975) (Sweeton I), I should explain why I am now concurring in this opinion.
I continue to adhere to the views expressed by Chief Justice Heflin that the definitional infirmities in the Alabama Red Light Abatement Act may not be cured by judicial construction because the United States Supreme Court, in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), specifically invited judicial construction as a method of supplying the required specificity in an obscenity statute, but not in a Red Light Abatement Act, which Acts have consistently been applied to houses of prostitution, etc., sought to be *717 abated as public nuisances. See, e. g., State ex rel. Cahalan v. Diversified Theatrical Corp., 396 Mich. 244, 240 N.W.2d 460 (1976), and cases therein cited.
In Cahalan, supra, the Michigan Supreme Court specifically refused to apply the Michigan Red Light Abatement Act to motion picture theaters. The Michigan act is almost identical to the Alabama act. California, Illinois, Iowa, New Mexico, and Pennsylvania have also refused to apply Red Light Abatement acts to motion picture theaters. People ex rel. Busch v. Projection Room Theater, 17 Cal.3d 42, 130 Cal.Rptr. 328, 550 P.2d 600, cert. denied, 429 U.S. 922, 97 S.Ct. 320, 50 L.Ed.2d 289 (1976); People v. Goldman, 7 Ill.App.3d 253, 287 N.E.2d 177 (1972); State ex rel. Faches v. N.D.D., Inc., 228 N.W.2d 191 (Iowa 1975); State ex rel. Murphy v. Morley, 63 N.M. 267, 317 P.2d 317 (1957); Commonwealth v. MacDonald, 464 Pa. 435, 347 A.2d 290 (1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).
So far as I have been able to determine, Alabama is the only state which has applied a Red Light Abatement Act to "movie theaters" when the latter term is not specifically referred to in the act itself. Nevertheless, a majority of this Court having committed the Court to this view in Sweeton I, I am bound to follow the majority and therefore concur in this opinion.
SHORES, J., concurs.
JONES, Justice (dissenting):
I dissent. My views are expressed in my dissenting opinion in McKinney v. City of Birmingham, 292 Ala. 726, 296 So.2d 236 (1974).
BEATTY, Justice (dissenting):
I was not a member of this Court when General Corporation v. State ex rel. Sweeton, 294 Ala. 657, 320 So.2d 668 (1975), I. e., Sweeton I, was decided. Consequently, I believe my analysis of the portions of that opinion which underlie the majority position today is proper and I feel adds weight to my dissent here. My reasons for dissenting are varied. The first portion is directed toward the misapplication of the law which the majority of this Court is working with. The second aspect of my dissent contains the reasons why I feel the law which this Court has not stated should govern this and all cases dealing with the unique freedom of expression possessed by American citizens.

I.
First, I do not believe that the Red Light Abatement Act, § 6-5-140, et seq., Ala.Code 1975 was intended by the Alabama Legislature to apply to obscenity.
Before today the first occasion in which such an act was held to cover the amorphous area of "obscenity" was in Sweeton I. That holding was against the full weight of authority across this land (as Mr. Justice Bloodworth points out in his concurrence today). Further, and perhaps more importantly, before Sweeton I the Alabama case law approved the application of the Red Light Abatement Act only to places of prostitution. See e. g., Ridge v. State ex rel. Tate, 206 Ala. 349, 89 So. 742 (1921) (Act applicable to a hotel or disorderly house wherein lewdness, assignation and prostitution occurred, and which was a source of venereal disease menacing the public health); and Brown v. State ex rel. Wright, 222 Ala. 623, 133 So. 913 (1931) (place of assignation and prostitution). Our case law has expressly held the Act not applicable in the following areas:
1. Act not applicable to a "honky tonk" where there is dancing and drinking on Sundays, and after 11 o'clock P.M. on week nights. Howard v. State ex rel. Andrews, 238 Ala. 185,190 So. 278 (1939).
2. Statute inapplicable to gambling nuisances. Young v. State ex rel. Almon, 253 Ala. 312, 45 So.2d 29 (1950).
3. Situation where alcoholic beverages were being sold in a location not zoned for it held not within definition of nuisance under Tit. 7, § 1091, Ala.Code 1940 (presently § 6-5-140, Ala.Code 1975). Kendrick v. King, 263 Ala. 487, 83 So.2d 241 (1955).

*718 4. Charging by Finance Corporation of excessive and usurious interest not within the statute. State ex rel. Powell v. General Acceptance Corporation, 269 Ala. 627, 114 So.2d 920 (1959).
I would be remiss if I did not point out that several cases from this Court have held that the "padlock and bond procedures" authorized by present §§ 6-5-147, 148, are also contained within the broad provisions applicable to liquor nuisances. Ex parte Hill, 229 Ala. 501,158 So. 531 (1935); Joiner v. State, 232 Ala. 522, 168 So. 885 (1936); Ex parte Harvell, 235 Ala. 63, 177 So. 345 (1937); Garrett v. State ex rel. Matthews, 235 Ala. 457, 179 So. 636 (1938). However this was not to say the reverse, that the broad provisions in the liquor or public nuisance statute are included within the narrow provisions of the Red Light Abatement Act. In no way did the Court in these liquor nuisance cases interfere with its holdings in Howard, supra, and in Kendrick, supra. This is clear from the language of Ex parte Hill, supra, approved by the cases cited above which followed:
Article 2, chapter 325, Code [1923], beginning with section 9280 [presently Tit. 6, Chap. 5, Art. 9, Div. 2, Ala.Code 1975, beginning with § 6-5-140], refers to a certain type of nuisance, as there specifically defined, whereas article 6 of chapter 167, beginning with section 4671 [presently Tit. 28, Chap. 4, Art. 10, Ala.Code 1975, beginning with § 28-4-220], relates peculiarly to liquor nuisances. There is a distinct proceeding in respect to the former (Brown v. State, 222 Ala. 623,133 So. 913 [1931]) not applicable to the latter. (emphasis added)
We see then that when Sweeton I was decided, there was no binding or persuasive authority before the Court which would point to the applicability of the Red Light Abatement Act to an obscene motion picture, nor had we ever found theretofore that the legislature intended for anything to be covered by the Act other than what was specifically mentioned in the Act, "lewdness, assignation, or prostitution." This specific definition is extremely important. On this issue Sweeton I cited a particular Illinois decision, People v. Goldman, 7 Ill.App.3d 253, 287 N.E.2d 177 (1972). There "it was held that, as used in its statute [strikingly comparable to our own], `lewdness' was a synonym for prostitution and therefore the Act did not apply to the activity there sought to be enjoined (a `pornoshop')." The holding in People v. Goldman, supra, was not a chance one. That case stated:
It appears to us too, that this statute is aimed solely and only at houses of prostitution. Only if we can equate the statutory `lewdness' with `obscenity', would we be justified in characterizing `places' for its dissemination and display as public nuisances. Obviously, the words `assignation' or `prostitution' in the statute, even with considerable stretching, can hardly be said to cover obscenity. Possibly `lewdness' in a given context might cover `obscenity' as defined in the Codea thing is obscene if its predominant appeal is to prurient interest, and if it goes substantially beyond customary limits of candorbut not here, as we interpret its meaning. The word `lewdness' is in disjunctive seriatim with `assignation or prostitution'. That aid to statutory construction, noscitur a sociis, i. e., associated words are of assistance in determining the exact meaning to be given a certain word, prevails here, in our opinion. Legislative words are not inert and derive vitality from the obvious purposes at which they are aimed. To fix purpose, we must read text in context and if a word is known by the company it keeps, then `lewdness' is synonymous with prostitution. This aid contemplates that where two or more words of analogous meaning are employed together in a statute, they are understood to be used in their cognate sense, to express the same relations, and give color and expression to each other. For example, an `assignation' could be an innocent appointment, a chaste tryst, or a rendezvous (even with destiny), at least those are meanings that can be so ascribed to it, but not here in its context with `lewdness' and `prostitution'.

*719 Thus `assignation', a euphemism coined years ago to protect the hypersensitive, is synonymous with `prostitution'. So, too, with `lewdness'it must equate with `prostitution', and `assignation' in the sense just described, if we are to follow the rule of noscitur a sociis and adopt that sense of the word which best harmonizes with its setting.
Besides noscitur a sociis there is another intrinsic aid to statutory construction, ejusdem generis, which adds more light on the proper construction of this statute's definition of "nuisance." Professor Sands, in 2A Sutherland Statutory Construction, § 47.17 (4th ed. 1973) defines ejusdem generis (also called Lord Tenterden's Rule) in this fashion:
Where general words follow specific words in an enumeration describing the legal subject, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words. [Citing among others, the case of Goode v. Tyler, 237 Ala. 106, 186 So. 129 (1939)]. Where the opposite sequence is found [as is the case with the Alabama Red Light Abatement Act], i. e., specific words following a general, the doctrine is equally applicable, restricting application of the general term to things that are similar to those enumerated.
The doctrine of ejusdem generis is an attempt to reconcile an incompatability between specific and general words in view of other rules of construction that all words in a statute are to be given effect, if possible; that parts of a statute are to be construed together; and that the legislature is presumed not to have used superflous words. . . .The rule `accomplishes the purpose of giving effect to both the particular and the general words, by treating the particular words as indicating the class [as in prostitution], and the general words [as in lewdness and assignation] as extending the provisions of the statute to everything embraced in that class, though not specifically named by the particular words.' (emphasis added)
If noscitur a sociis and ejusdem generis are applied to the Alabama Red Light Abatement Act, and I see no reason why they should not be, then in no way can the terms "lewdness, assignation, or prostitution" which specifically define the "nuisance" within that Act, be applied to an obscene motion picture. Therefore, the attempt by the majority in the present case to take the single term "lewdness" from the context of "assignation and prostitution"; add it to the "obscene" definition contained in our criminal statutes and point it in the direction of a motion picture is ludicrous. "Lewdness" at the time in which this statute was enacted only appeared in this Court's opinions in a prostitution context. For example the case of Haygood v. State, 98 Ala. 61,13 So. 325 (1892) defined "prostitution" in this manner:
A prostitute is a female given to indiscriminate lewdness for gain. In its most general sense, prostitution is setting oneself to sale, or of devoting to infamous purposes what is in one's power. In its most restricted sense it is the practice of a female offering her body to an indiscriminate intercourse with men. [Quoting State v. Stoyell, 54 Me. 24.] (emphasis added)
That opinion cited the case of Commonwealth v. Cook, 12 Metc. (53 Mass.) 93 for language which used the term "place of assignation" in the same sense as a "house of ill fame" or elsewhere, in which a person becomes a prostitute. Oddly enough, the terms which I am seeking to define here, all are used in this one brief case in defining "prostitution."[1] This lends weight to the premise that the doctrines of noscitur a sociis and ejusdem generis would themselves defeat the majority construction of the statute.
In Sweeton I Chief Justice Heflin gave the majority another reason why the Alabama *720 Red Light Abatement Act could not have been intended by the legislature to apply to obscenity:
[T]he majority opinion goes beyond statutes designated to control obscenity and attempts to make the Alabama Red Light Abatement Act a weapon against `hardcore pornography.' Obviously, the legislature felt that this act was not an obscenity control statute. This act was passed in 1919 and was on the books when the 1961 Obscenity Act was passed. The 1961 Obscenity Act possesses all of the injunctive relief features which the majority opinion would give to this act. See Title 14, §§ 374(5)-(11), Code of Alabama, 1940, as amended (1958 Recompiled 1973 Cumulative Supp.). . . .
However, the plurality opinion of Sweeton I disposed of that issue in this fashion:
Appellant argues . . . that notwithstanding curative judicial construction, the legislature did not intend the Alabama Red Light Abatement Act to be applicable. There is a substantial amount of persuasive authority for this proposition from judicial interpretation in sister states of their respective Red Light Abatement Acts strikingly comparable to our own. . . . [I]n Gulf States Theatres of Louisiana v. Richardson [287 So.2d 480 (La.Sup.Ct.1974)], the Louisiana Supreme Court reasoned that its public nuisance statute passed in 1918, only one year prior to our own, was originally designed to control prostitution and gambling and therefore could not be used in the First Amendment area. The court also emphasized the fact that the statute contained virtually no standards for making judicial determinations of obscenity. Accord, Southland Theatre, Inc. v. State ex rel. Tucker, [254 Ark. 639], 495 S.W.2d 148 (1973); Harmer v. Tonlyn [Tonylyn] Productions, Inc., 23 Cal.App.3d 941, 100 Cal.Rptr. 576 (1972).
However, from the broad language of Tit. 7, § 1091, Code, supra, there is no indication of any legislative intent to either include or exclude its application to obscene material. Controlling here is the fact that the Alabama Red Light Abatement Act has been construed as being merely declaratory of the common law, Duncan v. City of Tuscaloosa, 257 Ala. 574, 60 So.2d 438 (1952), and, as previously noted, acts at common law contrary to public morals were considered as public nuisances and subject to abatement as such. (emphasis added)
If it was controlling that the Act in question has been construed as being merely declaratory of the common law, then the majority in Sweeton I was definitely wrong when it found the statute applicable to obscenity. This follows because Duncan v. City of Tuscaloosa, supra did not construe the Red Light Abatement Act definition of "nuisance" as being declaratory of the common law, but merely found that the definition of nuisance and the distinction between public and private nuisances found within §§ 1081 and 1084 of Tit. 7, Code of 1940 (presently Tit. 6, Chap. 5, Art. 9, Div. 1, §§ 6-5-120,121, Ala.Code 1975) are declaratory of the common law. Those sections are totally divorced from the Red Light Abatement Act which falls within a separate division in Article 9 and which contains its own separate definition of nuisance. A perusal of the two definitions shows that in no way does the narrow definition of "nuisance" in § 6-5-140 of the Red Light Abatement Act parrot the broad, general common law definition of "nuisance" in § 6-5-120:
A `nuisance' is anything that works hurt, inconvenience or damage to another. The fact that the act done may otherwise be lawful does not keep it from being a nuisance. The inconvenience complained of must not be fanciful or such as would affect only one of a fastidious taste, but it should be such as would affect an ordinary reasonable man.
Section 6-5-140, on the other hand, defines nuisance as "[A]ny place in or upon which lewdness, assignation or prostitution is conducted, permitted, continued or exists. . . ." We harken back to this Court's findings in Ex parte Hill, supra. "Article 2, chapter 325, Code [1923], beginning with section 9280 [presently Tit. 6, Chap. 5, Art. *721 9, Div. 2, Ala. Code 1975, beginning with § 6-5-140], refers to a certain type of nuisance, as there specifically defined . . . ." (emphasis added). Howard v. State ex rel. Andrews, supra, also makes clear from its language that only the provisions of Div. 1 of Art. 9, Chap. 6, Tit. 6, Ala.Code 1975 are declaratory of the common law:
As a bill to enjoin a public nuisance within the definition of § 9271 of the Code [1923], Chapter 325, Article 1 [presently Tit. 6, Chap. 5, Art. 9, Div. 1, § 6-5-120, Ala.Code 1975] which is merely declaratory of the common law, the bill is without equity. Such bill can only be entertained when it is filed by the State on relation of the Attorney General, or by a private individual in his own name who suffers special injury or damage different in kind from that suffered by the public generally. (citations omitted)
The proceedings to abate nuisances provided for in Article 2, Chapter 325, §§ 9280-9298 [presently Tit. 6, Chap. 5, Art. 9, Div. 2, §§ 6-5-140154, Ala.Code 1975], are limited to nuisances as defined by said § 9280, as follows: `For the purpose of this article, the terms place, person, nuisance are defined as follows: Place shall include any building, erection, or place or any separate part or portion thereof or the ground itself; person shall include any individual, corporation, association, partnership, trustee, lessee, agent or assignee; nuisance shall mean any place as above defined in or upon which lewdness, assignation, or prostitution is conducted, permitted, continued, or exists, and the personal property and contents used in conducting or maintaining any such place for any such purpose.' [Italics supplied.]
Thus having shown that the Red Light Abatement Act was not intended by our legislature to be applied to this situation, i. e., "obscenity," I can only assume that this Court engaged in creative writing, i. e., judicial legislation, to hold that it did, both in Sweeton I (where this Act was said to have been found merely declaratory of the common law) and today in Sweeton II (where the per curiam opinion takes "lewdness" out of its context and states that it includes the exhibition of an obscene motion picture in a public place). I must reluctantly state that in my opinion this Court in these cases overstepped its authority under our Constitution and legislated an obscenity statute where there was none before.
This Court also erred in Sweeton I, and errs today, in its conclusion that the Miller, supra standards are properly applicable to the Red Light Abatement Act. I read Miller, supra to confine the scope of regulation of expression to depictions or descriptions of sexual conduct specifically defined in the applicable state law "as written or authoritatively construed." This, I believe, does not mean that a Red Light statute such as that before us can be changed into an obscenity statute by judicial construction; it merely means that an obscenity statute on the books such as § 13-7-160, et seq. which lacked a specific enough definition of the obscene expression (sexual conduct) sought to be regulated, could be construed specifically by the courts if the legislature did not itself do so. Chief Justice Heflin remarked much the same in his special concurrence in Sweeton I:
I interpret Miller as limiting judicial construction engraftments to statutes designed to specifically control obscenity.. . . In my opinion the majority opinion goes beyond the pale of permissible judicial construction and crosses over into the realm of exclusive legislative drafting by attempting to apply the same reasoning as was applied in Pierce [v. State, 292 Ala. 473, 296 So.2d 218 (1974)].
The majority's interpretation of Miller is strange indeed, for it as much as admits today that the Red Light Abatement Act was not intended by the legislature to cover obscenity when they construe the word "lewdness" to include an obscene motion picture, and then construe the Act to contain the definition of "obscene" found, not in the Act construed, but in the criminal obscenity statute, § 13-7-160, et seq., itself construed in light of and engrafted with the standards of Miller. Such an incestuous mating of case law guidelines, criminal obscenity *722 statutes, (themselves containing those same guidelines) and a "place of prostitution" statute can no more offer notice to the potential offender, can no more warm the chill that will numb the freedom of expression hereafter, can no more justify the holding here and in Sweeton I than we could justify the suppression of all expression. My own belief is that the Miller guidelines, and the engraftment of the obscenity definitions of § 13-7-161, and/or § 13-7-180 cannot cure the definitional infirmities of the Red Light Abatement Act when applied to a motion picture.

II.
My problems with the majority decision go much deeper than the obvious statutory infirmities of the Red Light Abatement Act when applied to an "obscene" motion picture. I perceive a fundamental disagreement over the role of government in that area of speech and expression called "obscenity." One properly may ask: What is the proper relationship between the First Amendment and government?
In explaining the sweep of the First Amendment's limitation on the federal government when he offered the Bill of Rights to Congress in 1789, James Madison is reported as having said: "The right of freedom of speech is secured; the liberty of the press is expressly declared to be beyond the reach of this government. . . ." (emphasis added) Hugo L. Black, A Constitutional Faith, at 46 [hereinafter Black] (1968) citing 1 Annals of Congress, 141 (1857) [1789-96]. The freedoms enumerated in the first ten amendments to our federal Constitution are beyond the reach of government because they were not granted or created by that Constitution as was our federal government, but were only guaranteed by it. There is a fundamental difference that helps me explain why I believe the right of speech and expression is absolute and unassailable by Congress, by courts, or any other area of government. To grant is to giveand the power to give in the realm of political theory is the power to take away. To guarantee on the other hand, is to protect something already in existence and in a political sense to recognize its unassailable character. Our founding fathers obviously believed that these freedoms were fundamental and basic to a free society. Their actions in guaranteeing these freedoms by incorporation into the same document that created our mechanism of government was meant to reassure the people that their government could never limit, or in any way take from them these rights. They were in effect saying "thus far shal[l] government go, and no farther." In fact, it has been stated by many learned men that the true end of government is the protection of such rights:
Government itself was formed so `that every member of society may be protected and secured in the peaceable, quiet possession and enjoyment of all those liberties and privileges which the Diety has bestowed upon him.' The end of government, in sum, [is] the preservation of liberty. Gordon S. Wood, The Creation of the American Republic, 1776-1787 [hereinafter Wood] (1969) at 21-22, citing West, A Sermon Preached . . . May 29th 1776, in John W. Thornton, ed., The Pulpit of the American Revolution: Or, the Political Sermons of the Period of 1776 (Boston, 1860), 274.
It was to this end that our federal Constitution was made the supreme law of the land. The prescient writing of Thomas Tudor Tucker suggests the political thought surrounding this event:
The constitution should be the avowed act of the people at large. It should be the first and fundamental law of the State, and should prescribe the limits of all delegated power. It should be declared to be paramount to all acts of the legislature, and irrepealable and unalterable by any authority but the express consent of a majority of the citizens collected by such regular mode as may be therein provided. Tucker, Conciliatory Hints, Attempting by a Fair State of Matters, to Remove Party Prejudice, Charleston St. Gazette of S.C., Sept. 21, 1786, cited in Wood, at 281.
*723 In a very real sense the Constitution and the rights it protects constitutes a contract between those who govern and those who are governed. The clear language of the First Amendment says that Congress (and the states through the Fourteenth Amendment) shall make no law abridging freedom of speech. There are no exceptions made for obscenity, no indication that only political speech is protected. And with good reason. As a native Alabamian once expressed it: "It is not difficult for ingenious minds to think up ways to escape even the plain prohibitions of the First Amendment. This same kind of ingenuity existed in the days of Rome. For example, it is said that Augustus punished people for criticizing the Emperor by the simple device of calling such criticism obscene." Black at 47. Our founding fathers knew the difficulties that would arise if there were only a limited guarantee of this freedom:
They knew what history was behind them; they were familiar with the sad and useless tragedies of countless people who had had their tongues plucked out, their ears cut off or their hands chopped off, or even worse things done to them, because they dared to speak or write their opinions. Black at 46.
I am aware that in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), the United States Supreme Court stated that the First Amendment was not absolute, that it gave no absolute protection to every utterance. As a member of this Court I must respectfully attorn myself to the authority of that decision, however that does not mean that I have surrendered my right to analyze it, indeed to criticize it in the direct context of the First Amendment.
In support of its interpretation of Roth, supra, the United States Supreme Court stated that at the time the Amendment was adopted thirteen of fourteen states had libel and profanity laws on the books and thus in light of this history the unconditional phrasing of the Amendment was not intended to protect every utterance. However, mindful of the political context and the contractual nature of the Constitution it is more likely that if the Amendment was meant to be limited it would have been limited expressly, as in a contract. If then, the Constitution and the rights therein guaranteed are in essence a contract between the people and the government, and the language of that contract means what it plainly says, then the Congress of the United States and the legislatures of the states have no legal authority to abridge the freedom of speech. If they have no such authority then laws enacted by them attempting to so abridge are null and void and this Court and other courts of the landsworn to uphold the Constitutionmust so recognize. In this particular case, then, even if the Red Light Abatement Act were properly applicable to pornographic motion pictures, it would be an improper restriction on the right of free expression.
I believe, however, that there is a role for government in this area. But the role government must play is not one of determining what is a misuse of the right of expression for that is censorship, but in seeing that an atmosphere does not arise that results in a disuse of that right. "It is not for [government] to cleanse public debate or to act as arbiters of taste." Fahringer and Brown, The Rise and Fall of RothA Critique of the Recent Supreme Court Obscenity Decisions, 62 Ky.L.J. 731, at 767 (1973-74). A quote by Mr. Justice Black aptly describes what is behind the actions of the majority of this Court today: "[C]ensorship, even under the guise of protecting people from books or plays or motion pictures that other people think are obscene, shows a fear that people cannot judge for themselves." (emphasis added) Black at 47. Their actions are also a confession that other significant social forces the press, churches, civic clubs, and other motivating forces in society, have failed to influence such forms of expression; that somehow by default government has become the moral babysitter of mature adults, leaving the courts to decide what people ought to think, ought to read, or ought to see in a motion picture. Aside from the fact that this is the kind of role the Constitution denies to government, it is a role for *724 which we, as judges, are ill-equipped. For example, the tests used by the federal and state courts to decide what is obscene have changed as often as ladies' hemlines. Mr. Justice Brennan, the author of Roth, supra, since that decision has thrown up his hands in resignation to the fact that it is virtually impossible for the courts to divide the obscene from other speech. Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). One portion of the Miller, supra test provides for the application of community standards in deciding whether or not expression is obscene. The impossibility of delineating the community standard has been apparent from the beginning. Even then, apart from the constitutional prohibition against our pontification in this area, I would have us leave it to the marketplace simply because of our own inadequacy to perceive for all citizens what is worthy of protection and what is not. Mr. Justice Brennan saw several problems stemming from attempts to divide the protected from that not protected. 1) The vague standards applied in the obscenity area fail to provide adequate notice. The Fourteenth Amendment requires that all criminal laws provide fair notice of "what the State commands or forbids." 2) Vague standards often result in a statute being overbroad, exposing protected as well as unprotected speech to prosecution. There is thus a "chilling effect" on the use of protected speech. 3) Last, because the standards are vague, all cases [civil and criminal] are marginal and unpredictable and must be decided case by case. This is a burden on the state as well as the federal judicial machinery. Paris Adult Theatre v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (Brennan dissenting).
That I firmly believe in the restriction against governmental intrusion on the area of expression should not be taken as evidence that I am in favor of lewdness or debauchery in any form or fashion. Without condoning such expression, I recognize nevertheless that other citizens may believe it plays a role in the shifting process of public values. A free society, and the individual citizens who make up that society, under our Constitution must be free to choose between the wholesome and the unwholesome, and I have faith that they themselves are more capable of making that choice than a few appointed or elected judges are capable of making it for them. I believe that such a conclusion is inescapable under the United States Constitution. The right to make that choice in any case, therefore, was guaranteed by the First and Fourteenth Amendments and this Court, and all courts, should recognize that in this area we are not meant to wander. I do recognize however that a person must be able to choose. Therefore I would not object to the Court's protection of those unable to competently make a choice or those unwilling to make a choice. The United States Supreme Court cases, Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414,18 L.Ed.2d 515 (1967), and Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) pointed to a possible holding which unfortunately for all never came to pass. That holding might have been that possession, distribution and exhibition of sexually explicit materials are all constitutionally protected, provided that children are not exposed and that the materials are not thrust upon unwilling adults. See Annot. Amendment 1Religion, Free Speech, Etc.: Obscenity, Constitution of the United States of America, Annotated (1973), at 1017-1018. Such a holding by this Court under our own free speech provisions, Art. I, § 4, Ala.Const. of 1901, or by the Supreme Court of the United States, would do away with such unworkable standards with which we have annointed ourselves, and would make it possible to deal with such cases from a fairly objective position.
This expression of my views on the constitutional aspect of this case has been an attempt to make our judicial actions consonant with what I believe to be the mandate of the United States Constitution and, accordingly, is stated in that spirit.
NOTES
[1] A cumulative obscenity law, passed in 1969, was codified at Tit. 14, § 374(16j)-(16o), contained in the 1973 cumulative supplement to the 1940 Code (Recomp.1958). The statute, which also contained a detailed list of sexual conduct, was not carried over into the 1975 Code.
[1] Volume 22 of Alden's Manifold Cyclopedia (Revised 1890) defines "Lewdness" as "lustful licentiousness; debauchery; unchastity." Interestingly enough Volume 31 of that same work defines "Prostitution" as "common lewdness for hire."