FAULKNER, Justice
(dissenting).
The majority opinion holds that the defendant’s business was properly determined to be a “public nuisance” within the meaning of the Red Light Abatement Act and as such could be enjoined and padlocked. In doing so the majority has completely ignored the severe impairment of the defendant’s First Amendment rights and has avoided any consideration of repeated errors in the trial of this case which, absent any violation of the First Amendment, would, in my opinion, necessitate a new trial. Consequently, I am compelled to dissent. Since the majority has chosen not to detail the facts of this case, I consider it appropriate to include them here.
Plaintiffs City of Birmingham and Police Chief Parsons brought suit on November 15, 1977, alleging that defendant maintained a theatre at 1727 Third Ave. North featuring sex related adult movies and nude or semi-nude female dancing, all for a monetary consideration. Plaintiffs alleged that the business had become a nuisance within *4 the meaning bf § 6-5-140 [1] and was a place where “lewdness, assignation and prostitution is conducted, permitted and allowed to exist.” They further alleged that in three years police had made approximately 300 arrests for sex related offenses at defendant’s business on Fourth Ave. North and Third Ave. North. Plaintiffs sought a declaration that the business was a nuisance and temporary and permanent' injunctions restraining the nuisance.
Defendant Ellwest Stereo Theatres had opened an “adult entertainment theatre” at 1727 Third Ave. North, Birmingham, in April, 1977, having closed its previous operation on Fourth Ave. North. Testimony at trial was restricted to the Third Ave. North address, a ruling plaintiffs did not appeal. Ellwest featured private locking booths designed to accommodate couples. Customers could enter the booths, deposit quarters in a slot, and watch a private showing of adult movies. The theatre manager testified that house rules (not posted) prohibited two males from utilizing a booth at the same time and if two males were observed entering a booth or discovered together in a booth the manager would ask them to leave. The parties agreed that minors were not allowed in the establishment and no alcohol was served.
Over a seven month period five arrests of customers had been made in these movie booths and were testified to at trial. On three separate occasions (May, September, and November) police arrested male customers who entered a booth occupied by an officer and masturbated in his presence. The individual arrested in May also solicited fellatio from the arresting officer. On two other instances police entered booths and arrested male customers engaged in fellatio. Police officers testified that they never registered complaints with the management. Their testimony, which fell far short of the 300 arrests alleged, also revealed that other businesses were the sites of significantly more numerous arrests for homosexual offenses.[2]
In the fall, 1977, defendant added a live dance show utilizing the same booth principle. Customers would enter a booth, deposit quarters, and a blind would withdraw to reveal a woman dancing. Viewers could communicate with the dancer through an intercom system. On approximately six occasions arrests were made of dancers clothed only in bikini panties. They were variously described at trial as fondling and licking their own breasts, and one individual was observed masturbating. On four occasions dancers were observed totally nude, although only two incidents resulted in arrests. One of these arrests involved a nude dancer observed masturbating. One of the nude dancers not arrested also solicited a vice officer, although the incident was not reported until trial. In fact, no arrests for prostitution were made at defendant’s business. Most of the arrests of dancers were made from November 3-12 and resulted in charges of dancing without a permit and, occasionally, indecent exposure. The *5 dance operation ceased on November 12 and was not resumed.
A hearing on plaintiffs’ motion for a temporary restraining order was held on November 22 at which defendant asserted that any nuisance had been abated and the requested relief would constitute an absolute prior restraint on activity presumptively protected by the First Amendment of the United States Constitution (i. e., the showing of films). Plaintiffs’ request for injunc-tive relief was continued to a final ■ trial date in February, 1978. At trial plaintiffs’ ten witnesses, all police officers associated in some way with the vice squad, detailed the “entertainment” and arrests of customers and employees. In addition, nine of these witnesses were allowed to testify that the general reputation of defendant’s business in the community for lewdness was bad, although several of them could not define lewdness (or defined it improperly) and a number of them revealed that their assessment was based on their work with the vice squad.
The trial court entered a final decree finding that “a nuisance within the meaning of Section 6-5-140 et seq. exists at defendant’s premises . [and] that the basis of such nuisance is the lewd and immoral conduct on the part of the employees and customers which defendant has conducted and permitted in the subject premises.” The trial court found that the activity complained of was pure “conduct” and stated in reference to films shown that “claimed incidental First Amendment rights cannot be used as an impenetrable shield to .protect lewd and immoral conduct and to effectively deprive the State of the means of safeguarding the health, safety and morals of its citizens.” The final decree enjoined the nuisance (at the premises and anywhere else in Jefferson County) and ordered the premises padlocked.
The majority opinion states, “[A]s we see it, the injunction does not prohibit the defendant from using the premises for a legitimate purpose.” Such a statement wholly overlooks the padlock provision of the trial court’s order which does in fact prohibit the use of the premises for any purpose whatsoever. Thus the order here is broader than that upheld by the California Court of Appeals in People ex rel. Hicks v. “Sarong Gals”, 42 Cal.App.3d 556, 117 Cal.Rptr. 24 (1974),[3] contrary to what the majority of the Court has indicated.
Furthermore, the order in the present case, and the majority’s approval of that order, shows utter disregard for the dangers of prior restraint on appellant’s presumptively protected speech activities. Testimony at trial clearly indicated that the primary purpose of appellant’s theatre was the showing of films. I cannot, therefore, agree with the trial court’s description of appellant’s films, his primary business, as “incidental First Amendment rights.”
It is now well established that our Red Light Abatement Act, § 6-5-140 et seq., *6 Code 1975, may be used to restrain the showing of a film found to be obscene under the provisions of that Act as construed by this Court. Trans-Lux Corp. v. State ex rel. Sweeton (S.C.1979) 366 So.2d 710 (Sweeton II); General Corp. v. State ex rel. Sweeton, 294 Ala. 657, 320 So.2d 668 (1975) (Sweeton I). In Sweeton I we indicated that the Red Light Abatement Act might be successfully used “where the impact of the injunction is absolutely devoid of prior restraint or chilling effect upon prospective exercises of expression other than that adjudicated as obscene.” Sweeton I at 666, 320 So.2d at 676. (Emphasis added.) Sweeton II is an example of the proper application of the statute in light of this principle. But the order in this case is an example par excellence of prior restraint of presumptively protected expression. While it may well be that the films shown by defendant could be themselves enjoined under the procedures of the Red Light Abatement Act, no attempt was made to do so. Until the particular films shown are determined to be obscene they cannot be restrained by the broad sweep of an injunction such as the one granted in this case. Of course, the practical effect of this necessary deference to First Amendment rights is to leave little, if any, room for operation of the padlock order provided for in § 6-5-151[4] when a movie theatre is involved. It should be remembered, however, that this State has other statutes in force which were specifically designed to deter and eliminate the showing of obscene movies while preserving the legitimate exercise of First Amendment rights. (See e. g. §§ 13-7-160, et seq.; 13-7-180, et seq.; 13-7-190, et seq.; 13-7-210, et seq., and 13-7-230, et seq.) Consequently, to curtail the operation of the padlock provision of the Red Light Abatement Act, or even to eliminate it altogether, does not make a serious dent in the State’s arsenal of weapons against pornography. Even under the Red Light Abatement Act a properly drawn order could enjoin the defendant from permitting or conducting on the premises activities found to be lewd, with violation of such an order punishable as contempt under § 6-5-154.[5] *7 The broad order in this case, however, should not be allowed to stand as it acts as an impermissible prior restraint on appellant’s activities presumptively protected by the First Amendment.
I must also take issue with the trial court’s finding that the evidence presented to it could support an injunction directed against the dance operation and homosexual activity occurring on the premises. In this regard the trial court made a finding that “the acts and conduct which occurred on the subject premises were acts of lewdness, prostitution and assignation within the definition and meaning of Section 6-5-140 . . . ” First I note that testimony revealed only one incident of solicitation for prostitution. No arrest was made, nor was the occurrence reported until time of trial. Obviously, one incident of solicitation is hardly enough to support a finding of a nuisance, so any finding that prostitution as contemplated by the Red Light Abatement Act was conducted or permitted on the premises is clearly erroneous. There was, however, testimony detailing a variety of acts (specifically, masturbation and fellatio) which could be properly termed obscene or lewd and therefore within the scope of the Red Light Abatement Act. (It should, of course, be kept in mind that the dancing ceased long before any injunctive relief was granted.)
In proving obscenity or lewdness the best evidence, in my opinion, is a factual description of the acts themselves, just as a film or publication is the best evidence of what it represents. Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). Nevertheless, the trial court also allowed testimony regarding the general reputation of defendant’s theatre, as is permissible under § 6-5-149(b). In doing so I believe it committed several errors which should not be ignored. While the majority avoids this issue by finding that the error, if any, was harmless, I believe that the cumulative effect of this improper testimony necessitates a new trial.
The plaintiffs’ case consisted of the testimony of ten witnesses, all associated in some way with the Birmingham Police Department, and more particularly, the vice squad. Basically, these witnesses, after detailing their experiences at Ellwest, were allowed to testify that the general reputation of the Ellwest Stereo Theatre for lewdness was bad.
At the outset I observe that the trial court seemingly misunderstood the concept of general reputation evidence. This is apparent from exchanges which occurred during the testimony of Willie James Hurt, an employee of Ellwest. On direct examination counsel for defendant questioned Hurt about the general reputation of Ellwest for homosexuality. An objection to the question was sustained at which time the trial court stated to co-counsel for the defendant:
“I am going to allow the testimony, as I just stated, relative to reputation. But to pinpoint the proposition based on hearsay evidence which it’s bound to be, and it’s not an opinion at all. He just asked a question that called for hearsay testimony. ... I will allow this witness to testify as to his opinion, based upon his statements he’s made, his qualifying statements as to whether or not the reputation in the community is good or bad.”
From these statements it appears that the trial judge felt that there were hearsay problems with Hurt’s testimony, when in fact hearsay is the gist of reputation evidence.
A noted authority on the law of evidence in Alabama has defined “general reputation” as follows:
*8 “It frequently is said that the general reputation of a person is what is said of him by those among whom he dwells or with whom he is chiefly conversant, even though there may not be unanimity of opinion among them concerning him. The good general reputation of a person, however, may arise from the absence of derogatory reports concerning him. Such is generally termed negative evidence of general reputation.
“Testimony of a person’s general reputation is opinion-hearsay evidence. Such testimony, in essence, is the witness’ opinion as to what the general opinion of the community is concerning such other person based on what the witness has heard or on what he has not heard.” C. Gamble, McElroy’s Alabama Evidence § 26.-02(3) (3d ed. 1977), citing Glover v. State, 200 Ala. 384, 76 So. 300 (1917).
Accord, E. Cleary, McCormick’s Handbook of the Law of Evidence § 249, at 595 (2d ed. 1972); 5 Wigmore, Evidence § 1609 (Chad-bourne Rev. 1970). “General character or reputation cannot be based on the individual or personal knowledge of the witness.” Stearns v. State, 266 Ala. 295, 96 So.2d 306 (1957).
This latter aspect of the rule of general reputation evidence was violated repeatedly in the testimony of plaintiffs’ witnesses. From a review of their testimony it is obvious that all nine of the witnesses who were allowed to testify on general reputation based their statements that “the general reputation of Ellwest Stereo Theatre for lewdness was bad” at least in part on their personal knowledge of the establishment obtained through their police work. For two witnesses (Holtam and Praytor) this was the only source for their statements. Several others (Luker, Bowden, Robertson, Cox, and Howze) made references to discussions with other officers and only five (McNutt, Robertson, Cox, Willis, and Howze) made any reference whatsoever to members of the community outside the police department. In this latter group McNutt admitted that he did not know what lewdness was.
In Stearns, supra, this Court observed, “The fact that on redirect examination [the witness] stated that his opinion was based on what he had heard and what he personally knew did not cure the error. Obviously, he was still making the point that his answer was based on his personal knowledge.” 266 Ala. at 297, 96 So.2d at 308. The reasoning of Stearns is applicable to the testimony of all the witnesses here. In most instances references to the “community” and “other citizens” were the result of tortured efforts to cure prior statements which had been objected to. Only rarely was this information volunteered by the witness. Usually it came out as a monosyllabic answer to a leading question. Objections were frequent, exchanges between counsel were sharp, and the rulings were confusing and not always adhered to. The cumulative effect of this questionable testimony was highly prejudicial.
In a similar vein it is obvious that the overwhelming portion of this testimony did not deal with Ellwest’s reputation “among members of the community generally” as is required. See Gamble, supra, at § 26.02(3). Instead it related to the business’ reputation within the police department and, specifically, the vice squad. Of course, the vice squad operates on the premise that establishments such as defendant’s are lewd. Consequently, to use vice squad officers to testify to the business’ general reputation simply begs the question. The situation is further aggravated when those individuals’ testimony primarily involves Ellwest’s reputation within the vice squad and police department. Obviously, if the vice squad and police department did not think the business was lewd they would not have supported a suit to close it down. The testimony of these witnesses on “general reputation” added nothing that was not evident from the filing of the suit itself, i. e., that the police department and vice squad considered this business lewd.
It has been noted elsewhere that “reason for distrust exists when the inquirer is a paid partisan agent who seeks evidence of one purport only.” 3 Wigmore, supra, at *9 § 692. This reasoning is the basis for the rule in Alabama that someone sent by the adverse party to investigate an individual’s reputation is not qualified to testify to that reputation. See Griffith v. State, 90 Ala. 583, 8 So. 812 (1890); Sorrelle v. Craig, 9 Ala. 534 (1846). The members of the vice squad were simply paid partisan agents sent by the adverse party to investigate defendant’s theatre. Thus, in light of their obvious bias and the understandable tendency of these individuals to base their statements on their personal knowledge and opinions gained through their police work, I consider it inappropriate to use members of the vice squad or other police officers involved in the investigation of a business to establish a business’ general reputation for purposes of prosecution under the Red Light Abatement Act. Of course, these same individuals should be able to testify, as they did in this trial, to specific incidents which they have observed so that the trial court may determine whether “lewdness, assignation, or prostitution is conducted, permitted, continued, or exists” on the premises so as to warrant injunctive relief. But if testimony of general reputation of a business is to be used, it should be used in a manner consistent with the law of evidence in this State.
Since the padlock order, in my opinion, operated as an impermissible prior restraint on presumptively protected activities under the First Amendment of the United States Constitution, I would hold that that order must be reversed. I would then remand for a new trial to allow the trial judge to determine what injunctive relief, if any, is appropriate and necessary.
JONES, J., concurs in the result.

. That section states:
§ 6-5-140. Definitions.
For the purposes of this division, the following terms shall have the meanings respectively ascribed to them by this section: (1) PLACE. Any building, erection or place, any separate part or portion thereof or the ground itself.
(2) PERSON. Any individual, corporation, association, partnership, trustee, lessee, agent or assignee.
(3) NUISANCE. Any place in or upon which lewdness, assignation or prostitution is conducted, permitted, continued or exists and the personal property and contents used in conducting or maintaining any such place for any such purpose.
Such conduct is prohibited in the following section:
§ 6 5 141. Who deemed guilty of maintaining nuisance.
Any person who shall use, occupy, establish or conduct a nuisance, as defined in section 6 -5-140, or aid or abet therein, and the owner, agent or lessee of any interest in any such nuisance, together with the person employed in or in control of any such nuisance by any such owner, agent or lessee shall for the purpose of this division be guilty of maintaining a nuisance and shall be enjoined as provided in this division.

. The list of sites of homosexual arrests included the Greyhound Bus Station and the restrooms at Loveman’s and Pizitz Department Stores as well as other “adult entertainment” establishments, hotels, bars and nightclubs.

. I also note that this opinion, the only one relied on by the majority to support its position, comes from Division Two of the Fourth Appellate District of the Courts of Appeal of California. The decision represented the views of only two judges and included a dissent. At that time the California Courts of Appeal included forty-eight judges. The California Supreme Court denied a petition for a hearing over the objection of Justices Tobriner and Mosk. The statement in the reporter does not indicate whether the California Supreme Court denied a hearing on the merits or for failure to comply with procedural requirements or provisions for further appellate review. “Sarong Gals” involved the sale of liquor, an activity subject to more extensive regulation and not present in this case. More directly in point are the cases of People ex rel. Busch v. Projection Room Theatre, 17 Cal.3d 42, 130 Cal.Rptr. 328, 550 P.2d 600 (1976) (padlock order would constitute unconstitutional prior restraint); People ex rel. Van de Kamp v. American Art Enterprises, 75 Cal.App.3d 523, 142 Cal.Rptr. 338 (1977) (padlock order refused); People v. Mitchell, 64 Cal.App.3d 336, 134 Cal.Rptr. 358 (1976) (preliminary padlock order refused even though theatre encouraged acts of public masturbation); Tarbox v. Board of Supervisors, 163 Cal.App.2d 373, 329 P.2d 553 (1958) (thea-tre management not responsible for lewd conduct of patrons where reasonable steps taken to prevent the conduct), all of which involved the showing or making of films and directly refute the position adopted by the majority of this Court. Under these circumstances, I cannot view "Sarong Gals” as persuasive authority in this Court in this instance.

. That section provides:
§ 6-5-151. Order of abatement; sale of property.
(a) If the existence of the nuisance is admitted or established in an action as provided in this division, or in a criminal proceeding in the circuit court, an order of abatement shall be entered as a part of the judgment in the case, which shall direct the removal from the place of all personal property and contents used in conducting the nuisance not already released under authority of the court as provided in sections 6-5-143, 6-5-145 through 6-5-148 and 6-5-150 and shall direct the sale of such thereof as belonged to the defendants notified or appearing in the manner provided for the sale of chattels under execution.
(b) Such order shall also require the renewal for one year of any bond furnished by the owner of the real property as provided in section 6-5-148 or, if not so furnished, shall continue any closing order issued at the time of granting the preliminary injunction or, if no such closing order was then issued, shall include an order directing the effectual closing of the place against its use for any purpose, so keeping it closed for a period of one year unless sooner released; but the owner of the place so closed and not released under bond as provided in section 6-5-148 may appear and obtain such release in the manner and upon fulfilling the requirements as provided in such section.
(c) The release of the property under the provisions of this section shall not release it from any judgment, lien, penalty or liability to which it may be subject by law.
(d) Owners of unsold property and contents so seized must appear and claim same within 10 days after such order of abatement is made and prove innocence to the satisfaction of the court of any knowledge of said use thereof and that with reasonable care and diligence they could not have known thereof. Every defendant in the action shall be presumed to have had knowledge of the general reputation of the place. If such innocence shall be so established, such unsold personal property and contents shall be delivered to the owner; otherwise, it shall be sold as provided in this section.
(e) If any person shall break and enter or use a place so directed to be closed, he shall be punished for contempt as provided in section 6-5-154.

. That section provides:
§ 6-5-154. Violations constituting contempt; proceedings thereon.
(a) In case of the violation of any injunction or closing order granted under the provisions of this division or of any restraining order or the commission of any contempt of court in proceedings under this division, the court or the judge thereof may try and punish the offender. The proceedings shall be commenced by filing *7 with the register or clerk of the court a complaint under oath setting out and alleging facts constituting such violation, upon which the court or judge shall cause a warrant to issue, under which the defendant shall be arrested; he may be released on bond, pending the hearing, to be fixed by the judge. The trial may be had upon affidavits or either party may demand the production and oral examination of witnesses.
(b) A party found guilty of contempt under the provisions of this section shall be punished by a fine of not less than $100.00 nor more than $200.00, or by imprisonment in the county jail not less than one nor more than three months, or by both such fine and imprisonment.